FREDERICK HEMSLEY

v.

MARLBOROUGH HOTEL COMPANY.

[Filed August 14th, 1901.]

1. Where a deed contains a restriction made for the benefit of the vendor's remaining land, the right to enforce the same passes to a subsequent grantee of the vendor.

2. Where a deed containing a covenant against certain buildings is made subsequent to a deed to other property, owned by the same vendor, the grantees in the latter deed do not take the land with the benefit of such covenant.

On bill for an injunction.

The complainant and the defendant owned lots in Atlantic City, the title to which came to them from common grantors. The complainant seeks to enjoin the defendant from an alleged violation of a covenant contained in deeds in the chain of title to the defendant, which covenant is in the following words: "Also that no building whatever shall ever be erected upon the above-described lot or piece of ground except as and for use as a dwelling-house." There follows a specification of special structures, the erection of which are forbidden.

This covenant, so far as it relates to matters involved in the present case, will be styled the dwelling covenant. The complainant charges, and it is not denied, that the defendant is about to erect upon its plot a large boarding-house or hotel.

The manner in which the complainant and defendant are related can be best stated by a reference to the accompanying diagram.

Hemsley *v.* Marlborough Hotel Co.

Recorded June 3, 1879.

The original lot, bounded by Pacific, Indiana, Ohio avenues and the ocean, was in 1879 owned by Hamilton Disston and George F. Lee. On May 28th, 1879, Lee and Disston made a deed of dedication of a street sixty feet in width, Market Park Place, and of the park marked Brighton Park. Attached to the dedication deed was the diagram above displayed, and reference was made to the plan of lots upon it, with a statement that the plan was to be recorded. The property now owned by the complainant is lot No. 1, Disston cottage, and No. 2 and No. 3 on said diagram. The lots owned by the defendant are numbers 14 to 20, inclusive, on the diagram.

As already remarked, the titles to the tracts of both parties · came from Disston and Lee. The title to lots No. 2 and No. 3, now belonging to complainant, is traced thus: Disston sold, on May 28th, 1879, to George F. Lee his undivided interest in lots Nos. 2 and 3 as well as in Nos. 4, 5 and 6. On September 11th, 1879, Lee conveyed the same lots to Mary Disston. The first of these deeds did not, but the latter deed did, contain a covenant against buildings other than dwellings, similar in language to the covenant already set out. It also contained a covenant against the sale of liquor.

On May 18th, 1880, Mary Disston conveyed lots Nos. 2 and 3 to Albert H. Disston, and he, on March 4th, 1881, conveyed them to one Corinth, who again, on October 20th, 1881, conveyed to Mary Disston. The title to the Disston cottage, lot No. 1, also now owned by complainant, came through a deed from Lee and Disston to Mary Disston, made May 28th, 1879. This deed contains no dwelling restrictions but a covenant against liquor selling only.

By these deeds it is perceived the title to lots 1, 2 and 3 came to Mary Disston. On October 1st, 1895, the trustees under her will, in conjunction with her husband, made a deed of these lots to the complainant, Frederick Hemsley.

The defendant traces its title for lots Nos. 15 and 16 through a deed from Lee and Disston to Amelia Sparks, dated September 10th, 1879. For lots Nos. 17, 18, 19 and 20 the title is traced through a deed from Lee and Disston to Mary Disston, made May 10th, 1880, and for lot No. 14 through a deed made

by Lee and Disston on February 10th, 1880, to Hinman Lander Hall. Each of these deeds contained a dwelling-house restriction, in the form already set out.

*Mr. Samuel H. Grey,* for the complainant.

*Messrs. Clarence L. Cole, David J. Pancoast* and *Richard V. Lindabury,* for the defendant.

Reed, V. C.

The defendant, in the first place, denies that the structure about to be erected is in violation of the covenant. Ordinarily the structure in question, intended to be in all respects, excepting the sale of liquor, a hotel, could not be properly styled a dwelling. When, however, the purpose of the restriction, as manifested by the designated structures which are specially forbidden, is sought, it becomes a close question whether, within the meaning of the parties to the contract, a building in which people dwell, although for brief and uncertain periods, comes within the forbidden class of structures.

But conceding that the structure contemplated is not a dwelling, what is the complainant's right to enforce the covenant?

It is entirely settled that where an owner sells a portion of his land, he can impose a restriction, not obnoxious to public policy, upon the use of his remaining land (*Brewer* v. *Marshall, 4 C. E. Gr. 537*), or upon the portion sold (*Coudert* v. *Sayre, 1 Dick. Ch. Rep. 386*), which covenant the owner or his grantee can enforce.

When such a covenant is included in the deed to a grantee and such covenant is made for the benefit of the remaining land of the vendor, the right to enforce the covenant passes to a subsequent grantee of the vendor. The questions primarily propounded are, does the complainant stand in the attitude of a subsequent purchaser from the vendor, with whom defendant's predecessor in title made his or her covenant; and secondly, was such covenant made for the benefit of the land subsequently sold to the complainant's predecessor in title?

The first deed in complainant's chain of title was from Disston

to Lee, putting a title in severalty in Lee to lots Nos. 2 and 3. The title to lot No. 1 passed from Lee and Disston on May 28th, 1879. The first deed in defendant's chain of title was to Amelia Sparks, dated September 10th, 1879. The Sparks deed, therefore, containing the covenant against buildings other than dwellings, was made subsequent to the first deeds in complainant's chain of title. And even if the deed from Lee to Mary Disston on September 11th, 1879, should be regarded as a deed from a vendor in common with the Sparks deed, yet the latter was acknowledged by one of the grantors on the 11th of September, and so neither can be regarded as possessing priority of time in the date of their execution. It cannot be said, therefore, that when the predecessors in title of Mr. Hemsley bought, they took the land with the benefit of the restrictive covenant contained in the Sparks deed attached to it.

So far, then, as the complainant's right to enforce the covenant contained in the Sparks deed, or in any other of the defendant's deeds, such right must rest upon a general scheme or understanding that all the lots plotted should be sold for residential purposes, and that each deed therefor should contain a restriction against other use. In respect to the restriction against buildings other than dwellings, there is no trace of a general understanding or scheme in respect to such covenants. The plot itself attached to the dedication deed indicates nothing but a division of the land into lots, upon which land is a dedicated street and park. Nor does the dedication deed itself contain any allusion to such a restriction. It does contain an agreement that the grantees of such lots shall covenant not to sell spirituous liquors. Nor does the method adopted in selling the lots show uniformity in the matter of restrictions. In most of the deeds, I think, there were restrictions against factories and objectionable buildings of like character. The dwelling restriction was only incorporated in a few of the deeds.

The Adams lot had been sold before the execution of the dedication deed, with only a factory restriction; and lots Nos. 7, 8, 9, 10 were afterwards sold with factory restrictions only.

Long before the present defendant bought the site upon which it proposed to erect a boarding-house or hotel the neighbor-

hood was studded with boarding-houses. Lots 7, 8 and 9 were the sites of buildings used by the Mercer Memorial Home as a boarding-house. Lot No. 10 was covered by the Revere Hotel and lot No. 11 by the Runnymede Hotel. These lots were conveyed, as already remarked, without dwelling-house restrictions. But, in addition, lots Nos. 12 and 13, conveyed to Hall with such restrictions, were each sites of buildings used as boarding-houses. Upon lot No. 12 was the Glasslyn and upon No. 13 the Chatham. These were, if the present structure will be, breaches of the covenant, which have remained unchallenged by the complainant or any other grantee. In regard to the use of the property now belonging to the defendant, it appears that Lewis T. Bryant, who sold to John J. White, who sold to the defendant, bought the property from the Female Academy of the Sacred Heart. The building upon the land was used in part as a boarding-school while owned by the academy. Mr. Bryant bought on May 31st, 1900, and took possession on the 1st of June. He changed the interior of the house and used it during the season as a hotel or boarding-house, under the name, exhibited upon two signs, of the Waverly Villa. No objection to its use as such was interposed by anyone. Indeed, the building upon lot No. 1, known as the Disston Cottage, was, and is, used by the complainant as an annex to his hotel, and in it guests are lodged in the same manner as in the main building.

It thus appears that there was nothing in the transaction to exhibit an understanding that the dwelling-house restriction was to be common to all grantees, and was to be inserted in all deeds for the benefit of the lands conveyed to the different purchasers, or that each purchaser was to be burdened with his own and benefited by the other covenants. These features were declared by Vice-Chancellor Green, in the case of *De Gray* v. *Monmouth Beach Club House, 5 Dick. Ch. Rep. 329, 340,* to be essential to a scheme which would confer upon one grantee the right to enforce a covenant made by another grantee with the common vendor.

The dwelling-house covenant is not to be found in all the deeds executed by Lee and Disston, nor in all the deeds executed by Mary Disston, who is also a common grantor of land owned by

the complainant and some of the land owned by the defendant, upon which a part of its structure is to be built.

Mary Disston's title to lots Nos. 1, 2 and 3 was, as already stated, conveyed by her testamentary trustees to the complainant in 1895. On October 15th, 1883, she being the then owner of lots Nos. 17 to 24, inclusive, upon which the building of the Female Academy of the Sacred Heart was afterwards placed, sold those lots to the academy. Her deed contained a covenant against the erection of buildings except for dwelling-houses, similar to the covenant already displayed. If this covenant was executed by Mary Disston for the benefit of lots Nos. 1, 2 and 3, then the complainant, standing in the attitude of a subsequent purchaser of those lots, has the right to enforce the covenant, unless precluded by some equitable consideration. The burden is upon the complainant to prove that the covenant was made for the benefit of these lots, and not merely for the benefit of Mary Disston. Substantially, in the language of Lord-Justice Bramhall, employed in the case of *Master* v. *Hansard, 4 Ch. Div. 724,* quoted by Vice-Chancellor Hall, in *Renals* v. *Cowlinshaw, 9 Ch. Div. 125,* the covenant must have been put in for the benefit of the purchasers of the remaining part of the land of Mary Disston, and not to enable her to make the most of her remaining property.

The purpose of a grantor, with whom a restrictive covenant is made, can, of course, be evidenced by the language of the covenant itself, or by other language in the deed which contains the covenant. It was so stated in the deed under consideration in the case of *Rogers* v. *Hosegood, 2 Ch. Div. 388 (1900).* Upon this ground the English appellate division, in that case, enforced a covenant entered into by a preceding grantee at the suit of a subsequent purchaser of the remaining land of a common grantor.

So, in the case of *Coudert* v. *Sayre, 1 Dick. Ch. Rep. 386,* a grantee, in addition to the restrictive covenant, further covenanted that the restrictive covenant should be enforceable, not only by the grantor, his legal representatives and assigns, but also by the owners of any of certain other designated properties of the grantor. This restrictive covenant was held to be valid,

and a subsequent grantee of a portion of the specified land was held to be entitled to the benefit of it.

Upon inspection of the deed made by Mary Disston to the Academy of the Sacred Heart, nothing appears to indicate that the dwelling-house restriction was for the benefit of anyone other than the grantor. Nor is there any provision for the insertion of similar covenants in other deeds to be made by the grantors. When we look for any other feature of the transaction which would disclose an intention that the covenant should attach to and be for the benefit of the other land of the grantor, there is entire absence of any evidence.

The absence of a general scheme in the sales made by Mary Disston is even more pronounced than in the sales made by Lee and Disston. In fact, when she made the deed to the academy, she had already sold portions of lots 4, 5 and 6 without any dwelling restrictions.

The complainant's case rests upon the one fact that at the time Mary Disston conveyed to the academy she was the owner of land separate from the land so conveyed. In the absence of any words in the deed to that effect, or any reference to a plan showing a general scheme for improvement, and that the grantee took the land with notice, express or implied, that the restriction was intended for the benefit of the remaining land, no right to sue passed to the subsequent grantee. *Skinner* v. *Shepard, 130 Mass. 180.*

But even if such a scheme had appeared either in the sales by Lee and Disston or by Mary Disston, the question would remain whether the complainant is not precluded from now enforcing against the defendant the restriction against the erection of buildings to be used as boarding-houses.

As was pointed out by Vice-Chancellor Emery in *Trout* v. *Lucas, 9 Dick. Ch. Rep. 361,* in the absence of any privity between the complainant and defendant, the right of the former rests upon a basis which is purely equitable. In two classes of cases courts of equity refuse the remedy by injunction—*first,* when the person imposing the restriction has allowed or acquiesced in material violations to the covenant, thus waiving the covenant *pro tanto;* and *second,* where the party injured has

not made prompt application for relief and has permitted money to be expended. In the case of *Trout* v. *Lucas,* the complainant was a subsequent purchaser trying to enforce a restrictive covenant contained in a prior deed made by a common vendor.

As I have already stated, the restrictive covenant against houses other than dwellings, if violated by using a building as a boarding-house, had been violated by other grantees of Lee and Disston. Upon lot No. 10 was the Glasslyn, a boarding-house with a capacity for about two hundred guests, and upon lot No. 13 the Chatham, a boarding-house with a capacity for about one hundred and fifty guests; the former had been used as a boarding-house for about ten years and the latter for at least that period. There were other boarding-houses upon other lots which were conveyed free from the dwelling-house restriction, and the neighborhood is one largely devoted to boarding-houses and hotels.

Now it is true that not every permitted infraction of the terms of a restrictive covenant will preclude the enforcement of it or other covenants. In *Knight* v. *Simmonds, 2 Ch. Div. 294 (1896),* there were restrictions against allowing any trade or business on the lots sold. The defendant proceeded to erect a large laundry upon the lot purchased by him, with the intention of carrying on the business of a laundryman. In a suit to enjoin him, the defence set up that laundries had been carried on for years without objection, and that some other trade also had been carried on for a length of time. Mr. Justice Romer found that such breaches of the scheme and covenants were trivial and privately carried on, and that there had been no acquiescence on the part of the residents in the breach of the scheme, and denied an injunction. On appeal the decree was affirmed, Lord-Justice Lindsley saying that the case fell within *German* v. *Chapman, 7 Ch. Div. 271,* and not within *Duke of Bedford* v. *Trustees of British Museum, 2 Myl. & K. 552* and *Peek* v. *Matthews, L. R. 3 Eq. Cas. 515.*

In *German* v. *Chapman, supra,* it was covenanted that no building should be used or occupied otherwise than as and for a private residence only, and not for any purposes of trade. Defendant proposed to erect a large building capable of holding

one hundred girls, the daughters of missionaries, who were to be boarded, lodged and educated there and supported by voluntary contributions. This was held to be in breach of the covenant. The defendant proved that the vendors had recently given permission to another purchaser to open a boarding-school for boys on the estate near the boundary of the property, which school was capable of accommodating about eighteen boys. This was held to be no waiver of the right to enforce the covenant by the complainant.

In the present case, however, there is something more than an acquiescence in a trivial violation of the covenant in respect to dwellings. The two boarding-houses, the Glasslyn and the Chatham, were, it is true, not so large as the house which the defendant proposes to build, but they were of a size to challenge attention as distinctive boarding-houses. They were, it seems, built and enlarged for that purpose. Their character was indicated by signs. They were located adjoining the defendant's lot. In addition to the presence of these houses under the conditions already displayed, with the acquiescence of everyone, including the complainant himself since 1895, there is the evidence of the user by the complainant of Disston cottage and of the attitude of the complainant towards the property upon which the new building is to be placed, and towards its owner.

It appears that Louis T. Bryant who sold to John J. White, who sold to the defendant, the Marlborough Hotel Company, bought the property from the Female Academy of the Sacred Heart. The building upon the land had been used in part as a boarding-school while owned by the academy. Mr. Bryant got his title on May 31st, 1900. Mr. Bryant says that after he had made his agreement for the purchase of the property and had paid $500 as a consideration, he met the complainant on a train; the complainant, he says, alluded to his purchase of the property, and Bryant asked him if he did not consider it a good hotel site, to which question Mr. Hemsley, the complainant, replied, "Yes" and called Bryant's attention to a restriction against building more than two hundred feet beyond the southerly line of the Sparks lot, or within fifteen feet of the westerly side of Park Place. This restriction was contained in the deed from

Mary Disston to the Academy of the Sacred Heart, and was made for the benefit of the vendor and her heirs.

Mr. Bryant says that he next saw Mr. Hemsley in the fall after he had paid $2,000 of the consideration, and he asked Mr. Hemsley if he would consent to a porch outside of the two-hundred-foot limit, and Mr. Hemsley refused to do so.

As already observed, Mr. Bryant took possession of the purchased property on June 1st, 1900, and ran the Waverly Villa during the season. Mr. Byrant says that, in the last part of the summer of 1900, Mr. Hemsley told him that he thought the property was a good site for a hotel; that if he had a hotel with enough baths in it he should do well. He further said that if Bryant would bring the plans over he would look over them. Afterwards, Mr. Bryant received a proposition from Mr. White to form a hotel company. Mr. Bryant says that he consulted Mr. Hemsley about the proposition, who told him that it was a serious matter, about which Mr. Bryant should consult a lawyer, but that he did not see how he could lose anything by the proposition. Bryant afterwards accepted the proposition, and the Marlborough Hotel Company was formed, of which corporation Mr. Bryant holds a large block of stock.

Just before he closed with this offer, he says he spoke to Mr. Hemsley about the dwelling restriction, and Hemsley said that there were a good many hotels on that side of the street, to which Bryant replied that it was difficult to get money on a mortgage with a restriction upon the property, and asked Mr. Hemsley if he would have the restriction removed, and Mr. Hemsley referred him to his lawyer.

After Mr. Bryant had conveyed his title to White, Mr. Hemsley sent for Bryant, and asked if they were going to build a hotel, and was informed that they were. Mr. Hemsley then said that there might be some trouble over the dwelling-house restriction.

Mr. White got his title from Bryant on March 14th, 1901, and the next day conveyed to the corporation. He began work on March 25th upon the property. He had called upon Mr. Hemsley in August, 1900, about the restrictions, and told Mr. Hemsley that he would like him to agree to a line a little nearer the ocean than the two-hundred-foot limit, and Mr. Hemsley

referred him to his lawyer, Mr. Thomas, of Philadelphia. He called upon Mr. Thomas, who said that Mr. Hemsley was unwilling to allow the building to go nearer the ocean than the two-hundred-foot line. As to the other restriction Mr. Hemsley was disposed to view more favorably, but wished to have a modification of the liquor restriction, so that he could use Disston Cottage as a part of his own hotel. White prepared an agreement releasing the liquor restriction, and wrote to Thomas on September 5th, stating the necessity of expedition in the matter. To this letter he received a reply from Thomas, notifying him that Hemsley would resist the erection of the hotel. White saw Thomas at once, without coming to any understanding, and again saw Thomas in November, and in the conversation between them Thomas said, "Why have you not gone ahead with your hotel? Mr. Hemsley expected your hotel to be well under way by this time." When asked why then he had written the letter, he replied, "You wrote a letter which seemed to require an answer, and you got it; but Mr. Hemsley has no intention to interfere with you." Thomas then said he was going to Europe, and affairs so remained until his return.

Mr. White again called upon Mr. Thomas, in response to a letter received by him on March 4th, 1901. At this interview he offered Thomas $7,500 for the privilege of extending the proposed building five feet beyond the two-hundred-foot line. He was afterwards told by Mr. Thomas that Mr. Hemsley declined the proposition. Mr. White then told Mr. Thomas that he would respect the line, to which remark Thomas made the reply that he was wise in so doing, and discussed the size of the house to be built, and told Mr. White he hoped he would be as successful with it as Mr. Hemsley had been with his. Thereafter the work proceeded on the new building—the old building having been removed—and on May 17th a letter was received, asking the intention of the defendant as to the kind of building to be erected and the purpose for which it was to be used, and protesting against the violation of any covenant by the defendant. A reply was sent to Mr. Hemsley on May 31st, setting forth the size, location and purpose of the new building. To this letter no reply was received.

At the time the notice was received work which had cost $4,257 had been done upon the ground and the foundation of the structure had been built. No intimation was received that the statement of the kind of building, its place and purpose, was not satisfactory to Mr. Hemsley. On June 28th he began this suit. At that time contracts had been entered into for the construction of the edifice, and the work of construction proceeded with by the contractor.

From facts that are undisputed it appears that Mr. Hemsley was informed by Bryant that he had bought the property for the purpose of building a hotel or boarding-house about the time of the purchase, and that the building was to be erected upon the site where Bryant carried on business in the Waverly Villa. The conversations with Mr. Hemsley detailed by Mr. Bryant are practically undenied. Mr. Hemsley does say that he did not give Mr. Thomas specific instructions to tell White that he (Hemsley) had no intention to interfere with the erection of the building; but he does not deny that he referred Mr. Bryant to Mr. Thomas as a lawyer who would express Mr. Hemsley's views respecting the restrictions.

Now, I would not attribute much force to casual conversations between Mr. Hemsley and Mr. Bryant which did not contain an express waiver of some particular restrictions, followed by a change of position induced by such waiver. But, taking the whole course of conduct of Mr. Hemsley and Mr. Thomas, I am constrained to the conclusion that the former is disentitled to ask aid of this court in arresting the defendant's work.

The point of objection in the earlier talks was against an extension of the proposed building beyond the two-hundred-foot line, and this was the main point of discussion in all the subsequent conversations. It is true that there was a refusal to discharge the dwelling-house restriction; but, from the whole tone of the conversation, it is apparent that this refusal was intended for the purpose of getting a discharge of the liquor limitation, rather than for the purpose of defeating the erection of a hotel. The agreement drawn for the purpose of discharging the land from the restriction against the sale of liquor would, I have no doubt, have been executed had not Mr. Thomas gone abroad in

the fall. Why it was not done in the spring does not appear; but it does appear that the conversation between Mr. Thomas and Mr. White, after the return of the former, was calculated to lead the latter to think that so long as he kept within the prescribed line there would be no trouble. I do not think it would now be equitable, after the loss of time and expenditure of money, induced, in a great degree, by at least a vacillating and uncertain attitude in respect to this restriction, to enforce it by injunction.

The bill is dismissed.