8 N.J. Super. 310 (1950)
72 A.2d 541
NATHAN N. HENDLIN AND ANNETTE HENDLIN, ET AL., PLAINTIFFS,
v.
FAIRMOUNT CONSTRUCTION COMPANY, A CORPORATION, AND THE CITY OF NEWARK, A MUNICIPAL CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided March 29, 1950.
*316 Mr. John J. Clancy, attorney for the plaintiffs, Nathan N. Hendlin, et al.
Mr. Maurice H. Pressler and Mr. Henry Gottfried, attorneys for the plaintiffs George J. Weinik, et al.
Mr. Charles Handler, attorney for the defendant the City of Newark.
Mr. Alfred L. Padula, attorney for defendant-cross-claimant Fairmount Construction Company.
Messrs. Ruback & Albach (Mr. Meyer E. Ruback appearing), attorneys for Maurice Levin and George Levin, defendants, counterclaimants and cross-claimants.
STEIN, J.S.C.
The controversy here presented for decision involves a number of causes of action, some purely equitable in nature, one sounding in mandamus, another seeking review in lieu of certiorari, while all the parties pray for declaratory judgment. Under the former practice these *317 issues, though between the same parties and though related because of common questions of law and fact, would have had to be tried in different courts. Even Chancery's power to pass upon incidental or related legal questions, once its equitable jurisdiction had been properly invoked, could not extend to those forms of relief which were obtainable only by the machinery of the prerogative writs issuable only out of the former Supreme Court. It is further proof of the merit and efficiency of our new court procedure that this court is enabled by reason of consolidation to hear and dispose of these various actions at the same time and by a single decision. As was pointed out by Chief Justice Vanderbilt in Steiner v. Stein, 2 N.J. 367, at 377:
"Were the trial judge in whichever division he is sitting not to hear the entire case once he has assumed jurisdiction, all of the confusion and waste of judicial effort which the framers sought to eliminate would reappear. * * *"
The actions here to be disposed of were consolidated into the within action by an order made by the Appellate Division of the Superior Court on November 21, 1949. The consolidated actions are now submitted by all the parties by a written stipulation in which it is agreed that the court's decision shall be made upon the following facts and proofs, viz.:
1. All uncontroverted allegations of fact and all admissions of fact contained in the various pleadings of the parties.
2. All the depositions taken in the cause and all exhibits received in evidence in the course of the taking of such depositions.
3. The transcribed proceedings before the Commissioners of the City of Newark at the various hearings relating to what is known as the "Ivy Hill" tract and relating to those actions taken by the said Commissioners which are challenged in this cause.
4. Certain specific facts set forth under sections 4 to 7 (both inclusive) of said stipulation.
5. Such inspection as the court itself would make of the Ivy Hill tract and the surrounding areas and neighborhood.
*318 In response to the request of all counsel in the case and attended by them, I visited the tract in question (which lies wholly within the City of Newark) and also made an extended inspection of the entire section in which the tract is located, including adjacent areas lying in the Village of South Orange, in the Township of Maplewood, and in the City of Newark itself. I was thus afforded a very adequate opportunity of observing the several neighborhoods to which reference is made in the depositions and viewing the types of structures erected thereon. This enabled me better to understand the testimony of the experts, who on some questions were in sharp conflict.
Essentially and primarily this is a zoning case in which property owners challenge the validity of an ordinance passed by the Commissioners of the City of Newark on October 5, 1949, amending the then existing Zoning Ordinance so that the entire Ivy Hill tract (including lands owned by the City and used for public purposes) was changed from a Second Residence District to a Third Residence District, thereby making lawful the erection upon said tract of multiple dwelling houses and apartment houses. A secondary dispute in the case relates to the action of the said Commissioners when on November 2, 1949, they adopted a resolution waiving, releasing and modifying a certain restrictive provision contained in an antecedent deed made on March 12, 1947, by the City of Newark to the defendant Fairmount Construction Company, by which deed there was conveyed to the grantee a tract of 52 acres and which deed contains the following provision restricting the use of the lands conveyed:
"That the use of the premises herein conveyed is restricted to one and two family dwellings, and it is hereby covenanted and agreed that the party of the second part, its successors and assigns, shall forthwith upon the delivery of this deed, commence and diligently prosecute to completion the development of the lands and premises herein conveyed and the construction thereon forthwith of approximately four hundred one and two-family dwellings. Each one-family dwelling house is to cost not less than Seventy-five Hundred ($7500.00) Dollars and each two-family dwelling house to cost not less than Twelve Thousand ($12,000.) Dollars. All improvements *319 and dwellings are to be made and completed substantially in accordance with the said plan of `Ivy Hill Park,' and the drawings and specifications annexed thereto, and a contract between the Fairmount Construction Company and The City of Newark, bearing even date herewith, all on file in the office of the City Clerk of The City of Newark."
In March of 1947 the City of Newark owned the original and much larger Ivy Hill tract, upon which it had previously erected two public buildings, an Almshouse and a Convalescent Hospital. It appears from the maps in evidence that the entire tract contained approximately 67 acres. The tract upon which the Almshouse is situate contains about 10 acres and the tract upon which the Convalescent Hospital is situate contains about 5 acres. Subtracting the last two areas from the acreage of the entire original tract, the City was possessed of approximately 52 acres which it offered at public sale. From the transcript of the hearings which are in evidence, it plainly appears that the Commissioners were in 1947 unanimous in their desire that the 52 acres, to be offered for sale, should be so developed as to furnish greatly needed additional housing, with preference to World War veterans. They were not, however, in accord as to the type of housing for which the acreage was to be used. At least one of the Commissioners was strongly for the erection of multiple dwelling structures. The final judgment of the body was that the lands should be sold for the purpose of having erected thereon one- and two-family houses, the former type to cost no less than $7,500 and the latter type no less than $12,000. That these figures, if they assumed probable costs, were fantastically sanguine was later proved by the test of experience. However, the advertised terms of sale expressed both the restriction of use and the minimum cost of construction contained in the provision which eventually was lodged in the deed of conveyance for the 52 acres. The highest bidder was the defendant Fairmount Construction Company. It paid for the lands $165,000 in cash. For the next two and a half years it proceeded with its construction project, erecting 122 dwelling houses. The character of these houses is of some importance. *320 It is claimed by some of the parties to this suit that all, or nearly all, of these structures are in fact four-family dwelling houses and that therefore any original community scheme or plan limiting the dwellings to two families (if any such community scheme ever existed) was abandoned either by common acquiescence or by common breach. I will deal with this question later in this opinion. I have seen the exterior of all these buildings and on the occasion of a second visit to the properties I inspected the interior of several of them. They are all substantially alike. Each separate structure contains four independent family apartments or flats. Each flat has its own separate living room, dining room, bedrooms, kitchen and bathroom. True, there is a partition wall running from the basement to the roof and on each side of that partition wall are separate entrance doors to the apartments. But all four units have a common front entrance porch and a common chimney. When these structures were being erected there was some complaint made to the City Commission that the Fairmount Construction Company was erecting four-family houses, thereby exceeding the limit imposed by the terms of the deed. The then Corporation Counsel for the City of Newark was of the opinion that the existence of a partition wall made the four units into two two-family houses. No action was taken to compel compliance, and of the 122 such houses erected 92 were sold by the Fairmount Construction Company between 1947 and the date of the commencement of this suit. I cannot accept the argument that these structures are two-family houses. It is impossible to view the exterior and examine the interior without reaching the conviction that they are four-family houses and nothing else. I so hold.
As Fairmount's building project advanced, it began to experience difficulty in selling the houses. Veterans, the intended preferential beneficiaries of this housing development, found it difficult, if not impossible, to purchase or carry the burden of investment and ownership. Somewhere in the course of the argument it was stated and undenied that these *321 four-family units were being sold at $42,000 per structure. With the Newark tax rate being what it is, of which the court may take judicial notice, and the financial capacity of veterans generally being limited, it is no little wonder that the Fairmount Construction Company realized that it was continuing to build in a lean market for property of that type and cost and that sooner or later it would have to abandon further building. Its problem was not one-sided. The City of Newark is notoriously suffering from a shortage of housing accommodations for the so-called "white collar class." The Fairmount had in its building enterprise utilized about 20 acres of the 52 acres purchased by it from the City. Here remained and lay an unbroken area of 32 acres, by far the largest single parcel in the whole City available for housing development. These 32 acres lay idle and there was every indication that unless some other building project were encouraged this large tract would yield neither housing nor ratables for a long time to come, for both of which benefits there was and is a crying need. When the Fairmount Company addressed itself to the City Commission and asked that it be permitted to erect upon the remaining 32 acres multiple dwelling structures, the Commissioners were hospitable to the idea. They were unanimous in their view that the welfare of the City required as quickly as possible additional housing to take care of a part of the 30,000 residents of Newark who were in need of housing and needed badly the tax dollars which would flow from the increased ratables. The divergence of opinion amongst the Commissioners was confined to the type of multiple housing that should be permitted. They were unanimous in the view that multiple apartments were needed and should be encouraged but were at first undecided as to type of apartment structures. The Commissioners were very deliberate in their study and consideration of the question. There were many public conferences and hearings at which all persons were given the fullest opportunity of advancing their various views. The objectors favored the utilization of these 32 acres for what are commonly called "garden apartments." The real *322 objection advanced before the Commissioners was not the erection of long rows of garden apartments but the erection of buildings that would go up "in the air." The argument was pressed that the erection of a 10- or 12-story building or buildings would create a public menace, in that the greater influx of population would produce a shortage or inadequacy in public school facilities, water service and pressure, and fire-fighting facilities, and, further, would create an undue congestion of vehicles parked on the public highways. It was even suggested by some of the objectors that the Fairmount Company had neither the experience nor the capacity to complete a project involving tall apartment houses accommodating approximately 2,000 units or apartments. After the Zoning Ordinance was amended on October 5, 1949, and before the Commissioners adopted on November 2, 1949, the resolution relating to the restriction in the deed, several objectors stated at an open meeting of the Commission that if the apartment house project were undertaken by such a concern as "Levin Brothers," whose building experience and financial stability were much lauded, the project would be well handled. Within that same interim the Fairmount Construction Company concluded a transaction with the same "Levin Brothers," whereby the latter agreed to purchase the entire tract, provided they were free to erect thereon apartment houses which would "go up in the air," they being of the opinion that that type of construction is the only economically sound one for those lands and that such was the best and highest use to which the lands could be put. At hearings before the Commissioners and by depositions taken in this cause, the "Levin Brothers," who are parties herein both as defendants, counterclaimants, and cross-claimants, have with considerable detail committed themselves to the number and type of apartment houses proposed to be erected. Of this I shall speak later.
It will here be noted that when the Board of Commissioners of the City of Newark amended on October 5, 1949, the then existing Zoning Ordinance, it changed from a Second Residence *323 District to a Third Residence District not only the 32 undeveloped acres involved in the proposed apartment house project but also the two tracts owned by the City of Newark, consisting of the Almshouse tract and the Convalescent Hospital tract. (See map Exhibit D-3 and the amending ordinance which is Schedule "B" attached to the "Complaint in Lieu of Certiorari.") It may well be assumed that by including in the change the two city-owned parcels of about 15 acres, the Commissioners intended to evidence their judgment that not only are the 32 acres owned by the Fairmount appropriate for apartment house construction but also the City's own retained 15 acres, if and when it should be the policy of the City to move those institutions elsewhere. Already there has been discussion in the public press of the City building a new hospital elsewhere in Newark and integrating therewith a convalescent hospital in lieu of the one at Ivy Hill.
It should also be observed that the restriction contained in the deed from the City to Fairmount was not fully waived, released or modified by the resolution of November 2, 1949, but only in a limited way. The resolution expressly states that the action is taken "so as to permit the erection of buildings for multiple dwellings and apartment houses," and that the resolution is adopted upon the undertaking of the owner that any apartment house or houses erected upon the lands will conform to the following restrictions, viz.:
1. No such building or structure will be erected nearer than fifty feet from the line of Irvington Avenue and from the line of Mt. Vernon Place (the only two streets upon which said acreage fronts).
2. The aggregate coverage of all such apartment houses (exclusive of garages) will not exceed in area 17% of the total area of the above described premises.
3. In addition to 1 and 2 aforesaid, the owner will render available to the Public Service Coordinated Transport land adequate in area and location for use as a loop for its buses, the same to be upon terms (as to each detail) mutually agreeable to the owners and said transportation company.
From the foregoing it is apparent that not only did the City Commission concern itself with the matter of proper *324 set-back but also with the more important question of the building coverage. The owners are by the terms of the resolution limited to a building coverage of 17% of the total area. That translates itself into a coverage area of 5.44 acres, leaving 83% or 26.56 acres of the vacant land for lawns, playgrounds, approaches, and parking areas. Even this self-imposed limitation was later cut down substantially by the voluntary commitment of the "Levin Brothers," as below shown.
Although there are some details which still remain to be worked out with respect to the building project here involved, the prospective owners and builders have in their depositions furnished maximum figures and limitations from which there clearly emerges a picture of the development when completed. There will be no more than five apartment houses on the entire tract. The land coverage of those buildings has already been reduced to 12%, with a fair prospect of a further reduction to 10%. Dealing with the higher of these two figures the building coverage would require 3.84 acres, leaving available for lawns, gardens, recreational facilities (including a swimming pool for the tenants), approaches, and parking space 88% of the tract, or approximately 28 acres. The buildings are to be no higher than 14 stories, to be built of steel, reenforced concrete, stone and brick, and will be what is known as 100% fireproof structures. The buildings will be serviced with elevators and they will, in the aggregate, accommodate a maximum of 2,160 units or apartments, the latter consisting of 3-, 4- and 4 1/2-room apartments. There will be on-site parking accommodations (both under-cover and open parking), so that the tenants' cars will be parked in various areas on the tract itself without any necessity for parking on the public highways. From their past experience, the builders expect that garage and parking facilities in the ratio of 50% to the number of occupied units will be adequate and will be furnished, but they are also prepared to absorb parking requirements up to 85%, assuming that each tenant will own and operate an automobile. That this will be done is not *325 disputed, the objectors insisting, however, that the added number of cars will cause congestion on the nearby highways approaching the tract itself. Undoubtedly the development of these 32 acres by any type of residential construction would result in an increase in the use of the highways, but Irvington Avenue, which passes a portion of the tract in question, is a wide artery for vehicular travel between Newark, Irvington and South Orange and is well able to carry the additional traffic. I cannot conceive of any such increased congestion as may not effectively be regulated by traffic lights or police attendance. Mt. Vernon Place will also share some of the extra traffic load, as will other highways in the immediate vicinity. I am well familiar with Irvington Avenue and have inspected the other highways in the neighborhood and I have observed the traffic conditions there. I haven't the slightest doubt that the extra traffic will be easily absorbed and that in respect of traffic congestion the proposed erection will create no hazards other than those which prevail everywhere that the automobile is operated.
I have carefully examined Exhibit D-4, which is a projected sketch of one of a group of apartment houses being erected by "Levin Brothers" in the Town of Irvington. It was offered in evidence as a fair indication of what the proposed buildings will look like when erected and completed on the Ivy Hill tract and when the landscaping is added. In the light of this exhibit and aided by a site plan submitted by the "Levin Brothers" to the Federal Housing Administration and approved by the latter, I was able to visualize the completed project here under consideration. I am favorably impressed with the result. The sample building is a handsome structure comparing very well with and surpassing in appearance many of the fine apartment houses that may be found on Harrison Street, Munn Avenue and Prospect Street in the City of East Orange. I have considered the proposed buildings in relation to the neighboring structures and I am satisfied that they can have no adverse effect upon the latter. An important fact is that there are no buildings on the 32-acre tract itself and, *326 therefore, the tract may be regarded as a large, independent and self-integrated area. On the Irvington Avenue side of the tract the apartment houses will come no nearer than 200 feet to the southerly side of the road and no nearer than 250 feet to the dwelling houses which are located on the opposite side of the road, in Maplewood. Those dwelling houses are small in size and very modest in appearance, many of them being of the one-story bungalow type. On the easterly side of the tract the owner has set aside a buffer area of 250 feet, so that none of the proposed apartment houses will approach any of the properties owned by the objectors any closer than 250 feet. The tract is bounded on the north by Mt. Vernon Place. The opposite side of Mt. Vernon Place marks the southerly line of a public park which extends inward for a considerable distance to the southerly line of the Seton Hall College campus, on which college grounds there are large buildings. On the westerly side the tract in question is bounded by the line which divides Newark from the Village of South Orange. The first street beyond that line is Eder Terrace, on the easterly side of which are erected a long row of small and very inexpensive one-family houses. I reject the claim that the apartment houses will adversely affect the light and air of the neighboring properties. On three sides of the tract such effect is utterly impossible, since the intervening space between any of the apartment houses and the nearest property of any objector is more than the length of an ordinary city block. On the westerly side the apartment houses will be so placed and spaced that there will be considerable distance between the rear of the houses on Eder Terrace and the nearest point of any of the proposed apartment buildings. The height of the proposed buildings cannot be the sole consideration on this question but rather the spacing between the buildings. A two-story building built too closely to an adjacent one-family house can more effectively cut off light and air than a 20-story building erected sufficiently far away. The objectors lose sight of the fact that of the 32 acres less than four acres will be covered by the apartment houses *327 and more than 28 acres will be open spaces. It seems to me that what is proposed is far more beneficial and therefore preferable to the continued erection by the Fairmount Company of the closely spaced four-family houses to which I have already referred.
When the record is studied one realizes that the true objection from the opponents to the project is the height of the buildings. Their experts assert that the tall buildings will dwarf the neighboring dwellings. One of the Commissioners who voted for the zoning amendment but later voted against the resolution relaxing the restriction spoke of the proposed apartment houses as sticking up "like a sore thumb." Such views are clearly matters of aesthetic consideration and constitute no valid objection. In City of Passaic v. Paterson Bill Posting Co., 72 N.J.L. 285 (E. & A.), the court considered an ordinance which forbade a sign or billboard higher than eight feet above the surface of the ground. The court ventured the thought that the ordinance "was due rather to aesthetic considerations than to considerations of the public safety," and then added the following: "No case has been cited, nor are we aware of any case which holds that a man may be deprived of his property because his tastes are not those of his neighbors. Aesthetic considerations are a matter of luxury and indulgence rather than of necessity, and it is necessity alone which justifies the exercise of the police power to take private property without compensation." See, also, Romar Realty Co. v. Haddonfield, 96 N.J.L. 117.
The modern tall and well-constructed, fireproof apartment house has come to stay. It is part and parcel of the growth of urban community life. In some cities such structures have completely replaced fine old mansion houses, as on Park Avenue, in the City of New York. In other communities such apartment houses stand alongside fine residences, such as on Fifth Avenue and on Riverside Drive, in New York City, and on several streets in East Orange. Undoubtedly owners of private homes in the neighborhood would much have preferred that the apartment houses go elsewhere. Their wishes, *328 however, grounded in personal tastes, could not and did not prevail against the neighbor's right to make any lawful use of his property, providing it did not endanger life or health or the community's general welfare.
The stipulation upon which this dispute is submitted for decision carries with it the following admissions:
(a) The present school facilities servicing the Ivy Hill neighborhood would be overtaxed by the influx of new school children coming from the apartment houses when erected.
(b) The present water service and pressure would be inadequate to take care of the tall apartment structures.
(c) The City's present fire-fighting facilities in the neighborhood would be inadequate to cope with any fire in an apartment house of such height as is proposed.
(d) That a certain other school elsewhere located will, when completed, cost the City $2,500,000 and will accommodate 1,000 pupils.
(e) That the City Commission has promised that as the proposed apartment houses are completed, in from one to two years, and the structures begin to be occupied, all the municipal facilities (schools, water service and pressure, and fire-fighting facilities) shown by actual experience to be additionally required because of the new buildings will be furnished by the City of Newark as and when needed. The parties admit that the City has the capacity to acquire and to furnish such additional facilities as and when needed.
(f) Such additional facilities will cost more because of the apartment houses than they would cost if the tract were developed by the erection of the kind of houses heretofore erected in the neighborhood by the Fairmount Company.
It is no valid objection to the project in question that the aforementioned facilities, as presently available in the neighborhood, will be inadequate when the apartment houses are completed and are fully occupied. It is the duty of the city authorities to supply all such facilities as need for them appears. The like objection was made in the case of Ingersoll v. South Orange, 3 N.J. Misc. 335, not official reported (Sup. Ct. 1925); affirmed, 102 N.J.L. 218 (E. & A.). There a mandamus was sought to compel the issuance of a permit for the erection of an apartment house. The case contained a stipulation in which it was admitted that the authorities would testify that South Orange "has not sufficient fire facilities to *329 adequately take care of apartment-houses in the event of fire." On this subject the court said:
"Upon the question of the lack of fire-fighting forces and inability to secure firemen to supplement and increase the present strength of that municipal department as a justification for the prohibition in the zoning ordinance against the erection of apartment-houses we are inclined to look with disfavor.
"We think it is a plain duty resting upon the municipal authorities of the village to furnish and provide to its inhabitants reasonably proper and adequate fire protection. We think it would be unreasonable to hold that the adequacy of such a department should be maintained by restricting building and construction, but that, on the contrary, such adequacy should be maintained and keep step with increases in buildings and resulting increase of fire hazards by increasing and enlarging the fire department in men, apparatus and efficiency."
In the case of E. & M. Land Co. v. Newark, 4 N.J. Misc. 467, not officially reported (Sup. Ct. 1926), a building permit for an apartment house was refused because of its height and because of alleged increased fire hazard, lack of school facilities, and lack of sewerage facilities. The court said those contentions were, in effect, decided to be without merit in the case of Ingersoll v. South Orange, supra.
In the following cases similar objections were rejected by our courts, the Ingersoll case being cited in each case with approval:
Rudensey v. Montclair, 4 N.J. Misc. R. 103, not officially reported (Sup. Ct. 1926). Here the claim was increased fire hazard and alleged danger from increased traffic on the highways; Eaton v. South Orange, 3 N.J. Misc. R. 956, not officially reported (Sup. Ct. 1925). Here the claim was "that the present fire department is inadequate to take care of apartment houses of the type proposed."; Williams v. Gage, 3 N.J. Misc R. 1095, not officially reported (Sup. Ct. 1925). Here one of the claims was that the fire hazard would be increased; Hirschorn v. Castles, 113 N.J.L. 277. Here it was claimed that the proposed construction would be a menace to motorists, would increase the fire hazard, and would congest traffic.
The cases last cited dispose of all the objections which have been raised in this case concerning congestion of traffic, inadequacy *330 of present school facilities, water service and pressure, fire-fighting equipment and the like. Not only are the city authorities obliged in the performance of their official duty to furnish these facilities as and when and to the extent needed but in the instant case it is expressly stipulated that the City Commission has, in fact, promised to furnish these facilities as and when the buildings are completed and occupied and the need for the additional facilities appears. The stipulation in the case carries with it the unqualified admission that the City has the capacity to acquire and furnish these facilities as and when needed. The court is not concerned with the economics involved in the performance of that duty. It matters not that the Dayton Street school in the Weequahic Park section will have cost $2,500,000. That fact is undoubtedly offered to indicate to the court that additional school facilities would be a costly enterprise. Whether the increased ratables to be realized by the City justify the additional expense is not a matter for judicial determination. It is entirely a matter of business judgment and policy committed to the honest judgment of the municipal authorities.
The real estate experts called by the opposing sides in this case disagree as to whether the proposed erection will cause a decline in the market values of neighboring properties. One expert predicts a decline ranging from 10 to 25%. The opposing experts deny any such decline and insist that, on the contrary, the erection of these apartment houses would reflect beneficially on neighboring properties. Although I personally believe that the project will benefit the entire section and will cause no decline in values, but perhaps create an increased land value for apartment house construction, I need not decide that factual dispute. Our decisions dispose of the objection. In Williams v. Gage, supra, the erection of a gasoline station was resisted on the ground that such construction would tend to lower real estate values. The court said:
"The respondent further contends that the refusal to grant the permit was justified because a gasoline station in the locality would tend to lower real estate values. There is in the record opinion *331 evidence to this effect. This is no defense. There is probably some property owner in every locality who entertains a belief that the erection of any new building in the vicinity of his property will tend to lower the value of his property. The owner of property is not required to conform to the ideas, aesthetic or otherwise, of other property owners as to the use he may make of his property, provided he uses it in a manner which is not detrimental to the public health, safety or general welfare. If property owners were obliged to conform to the opinions of others as to the use their property should be put, few communities would ever emerge from their primitiveness."
In Hirschorn v. Castles, supra, one of the objections to the proposed construction was that the proposed building would tend to depreciate the value of surrounding properties. The court held that the objection was frivolous.
Having disposed of all the objections advanced against the proposed construction, I am now brought to the remaining question, whether the Commission's actions in amending the Zoning Ordinance and, later, in adopting the resolution relating to the deed restriction were valid. On this question I find it unnecessary to cite the numerous decisions to be found in our reports. The very recent decision in Taylor v. Hackensack, 137 N.J.L. 139, unanimously affirmed in 1 N.J. 211, furnishes the last word on the subject and is a lamp for my feet. The facts there present are closely parallel to those in the instant case. There one Ingannamort was the highest bidder for lands offered at public sale by the City of Hackensack. At that sale a single-family dwelling restriction was publicly announced as part of the conditions of sale. It was also the fact that at the same time the lands were by zoning ordinance restricted to the erection of single-family dwellings. The restriction was embodied in a formal contract entered into between the City and the purchaser on April 14, 1945. More than two years later the purchaser desired both an amendment to the zoning ordinance and the modification of the building restriction contained in the contract, so that he might erect apartment houses which, by the terms of both the zoning ordinance and the restriction in the contract, he was prohibited from building. His request was honored. On June 2, 1947, the zoning ordinance was amended and on July *332 7, 1947, the contract was by resolution modified so that garden apartments or multiple family dwellings were permitted. Both actions were challenged on certiorari. With respect to the ordinance amendment the court said:
"It will be noted that, in point of time, the first municipal action sought to be reviewed is the amendment of the zoning ordinance of June 2d, 1947. It is well established by the decisions of our court that the governing body of a municipality may amend its zoning ordinance any time it deems circumstances and conditions warrant such action and such an amendment is unqualifiedly valid, if the procedural requirements of the statute are complied with; and providing such amendment is not unreasonable and capricious and is in furtherance of the design of the zoning statute. We are of the opinion that the prosecutors, upon whom the burden falls, in attacking this amendment, have utterly failed to establish that the zoning amendment was unreasonable and capricious, or that its passage was not in conformity with the statute. In fact, prosecutors fail to discuss this point in their brief. We hold that said amendment of the zoning ordinance is valid and enforceable and is dispositive of the issues sub judice."
With respect to the resolution modifying the restrictive features of the contract, the court said:
"Under Point (3) of prosecutors' brief, they argue `The City of Hackensack was without authority to change the formal contract entered into between it and Ingannamort under date of April 14th, 1945, by the adoption of the resolution of July 7th, 1947, and/or by the change of zone under date of June 2d, 1947.' A careful reading of prosecutors' argument on this point reveals that they do not cite a single case as authority for their contention. Prosecutors argue that the municipality cannot dissolve the contract in question by the adoption of a resolution. However, that is not the decisive factor. The controlling element is not and cannot be the resolution of July 7th, 1947, waiving the restrictive covenants in said agreement of sale. The passage of said resolution was utterly meaningless in view of the action of the City of Hackensack, through its governing body on June 2d, 1947, when it formally adopted an amendment to its zoning ordinance and changed the land in question from a single-family to a multiple-family zone. * * *
"Obviously, prosecutors' argument narrows the issue to the proposition that the City of Hackensack, having sold the property with a restrictive covenant attached thereto, it is estopped from amending the zoning ordinance in a manner which will, to all intents and purposes, wipe out the restrictive covenants so imposed. We hold that *333 there is no such limitation on the right to zone, and that the amendment in this case is valid unless prosecutors can establish that the amendment was capricious or unreasonable, and that they have failed to do." (Italics mine.)
In the instant case no claim is made that the zoning amendment of October 5, 1949, was not passed with full observance of all statutory requirements. In fact, complete observance plainly appears in the case. The effect of such amendment was, as is pointed out in the Hackensack case, to wipe out "to all intents and purposes" the restrictive covenants imposed by the contract of purchase. I might well say here, as was said in the Hackensack case, that, in view of the earlier zoning amendment, the later resolution modifying the restrictive covenant "was utterly meaningless" and need not be reviewed. However, it appears from the resolution itself that in adopting it the City Commission exercised the power reserved to it by Section 40:60-51.2 of the Revised Statutes of New Jersey, 1937. Under that statute any municipality is authorized by resolution to waive, release or modify any covenants, conditions or limitations as to the erection of buildings or any other use to be made of land imposed by the municipality in sales and conveyances made by it at public or private sale, "provided, however, that the power herein granted shall not be exercised to impair any vested or contractual rights of third parties." Those objectors who have purchased dwelling houses from the Fairmount Company seek refuge under the last quoted proviso. The claim is made that the restricted use expressed in the deed from the City of Newark to the Fairmount Company was intended to establish a general or community restrictive scheme and that the officers and representatives of the Fairmount Company advertised that they were erecting and selling two-family houses and made the like representation to each purchaser of such dwelling house. It is insisted that such purchasers bought with notice of the restriction in the deed to the Fairmount Company, that they relied upon the presence of that restriction in that deed, and that therefore they have some vested or contractual *334 right which cannot be impaired by the City Commission's resolution of November 2, 1949. This argument calls for attention.
It is admitted in the plaintiffs' complaints that the restrictive covenant contained in the deed from the City to the Fairmount Company was not reiterated or referred to in any of the deeds which the Fairmount made to the purchasers of the 90 dwellings sold by that company. Yet those purchasers say that they regarded themselves "as privy to the benefits and protection intended to be afforded by said restrictive covenant."
Examination of the so-called restrictive covenant discloses that if it is that, it is only so by implication. There is no express promise on the part of the grantee that it will not erect on the lands structures other than one- and two-family dwellings. It might well be construed as a limitation on use. Giving it, however, the broader construction of an express negative covenant, the fact remains that it utterly lacks all the indicia of an intended general or community scheme intended for the benefit of all subsequent purchasers. It contains no provision that it shall bind the grantee's successors and assigns or that it shall attach to and run with the land or that the grantee will insert the like restrictive covenant in conveyances made to ultimate purchasers. The covenant has none of the recognized features of a community scheme but rather every earmark of a purely personal covenant, enforceable only as between the immediate parties thereto. The burden is always upon the plaintiff seeking to enforce a claimed restrictive covenant to prove that the covenant was made for the benefit of the covenantor's lands and not merely for the benefit of the covenantee, the grantor who exacted or imposed the restriction. Hemsley v. Marlborough Hotel Co., 62 N.J. Eq. 164, 170. In the case of Sailer v. Podolski, 82 N.J. Eq. 459, 463, it is stated that in order to enable subsequent purchasers to take the benefit of restrictions contained in a prior deed, it is necessary that that deed clearly define the property intended to be benefited by the restrictive covenant. It is *335 there pointed out that the covenant there considered was solely the covenant of the earlier grantee; that the "grantors neither bind themselves to enforce or perpetuate the covenants against their grantee and his assigns nor to create or enforce similar or any covenants against subsequent purchasers of other parts of their land, nor do the covenants in any way state that they are for the benefit of subsequent purchasers of all or any part of the unsold lots of grantors; the covenants are in form purely personal covenants of the grantee to his grantors, restricting the manner in which the grantee should use the land granted." The court there said that if a contrary intention had been intended "the accurate ascertainment of that intention is clearly necessary to clothe the subsequent purchaser with the right of enforcement of the covenants."
In Majeski v. Stuyvesant Homes, Inc., 140 N.J. Eq. 460, it was said that "restrictions upon the use of real estate are not viewed judicially with favor and that restrictive covenants are enforced in equity only when they are clear and reasonably definite with respect to the inhibitions sought to be thereby imposed" and that "restrictions limiting the use of lands are always to be construed strictly, and ambiguities and uncertainties in the restrictive provisions of grants are to be resolved in favor of the owner's free use of his property" and that in restrictive covenant cases equity will not interfere by injunction unless the right to that relief is clear.
In the instant case the court is not put to the necessity of resolving in favor of the owner of the land any doubt or ambiguity in the restrictive provision. It is perfectly clear that the covenant was one purely personal between the immediate parties thereto and that it was exacted by the City of Newark for its own sole benefit and as an incident to its building contract with the Fairmount Company, by which the latter obligated itself to build on the whole tract approximately 400 dwelling houses. The City authorities at that time wanted the entire 52 acres to be developed with the type of structure approved by them, and exacted from the purchaser an agreement so to build. The covenant was ancillary *336 to the then contemplated building project and was designed to implement the development then in contemplation. The City procured the covenant for its own protection and benefit. One reason for the City needing and wanting such covenant personal to itself was the circumstance that when it sold to the Fairmount Company it still retained approximately 15 acres of land, then and since used by two of its public institutions. The City Commissioners might well have envisaged the time when those institutions might be transferred to other localities and the City would have no further need for those acres and would wish to sell them for such use and development as would at such future time be considered most advantageous to the municipality and in the best interests of the community at large. Conceivably, such purpose might dictate that the retained acres be sold subject to a restricted use like the one imposed in the deed to the Fairmount, in which situation the City would simply keep intact and would preserve and enforce the already outstanding restriction. On the other hand, changed conditions might persuade the judgment of the municipal authorities that the outstanding restriction is no longer required to protect the City's retained holdings, in which situation it would be free to alter, modify or even waive and release the restriction, a right purely personal to itself. The wisdom or policy of so doing is a matter committed to the business judgment of the City's business managers  here the Board of Commissioners. That judgment may not be reviewed by the court except upon a showing of fraud. None is alleged in any of the complaints and none has even been intimated in argument. It is therefore held that the said restrictive covenant created no such right in ultimate purchasers from the Fairmount Company as forbids or prevents the original parties to the covenant from modifying or releasing the same. Plaintiffs have no legal or equitable interest in that matter.
Was there a community scheme which could be said to exist independently of the restrictive covenant? That is purely a fact question and the burden is on the plaintiffs to establish the fact. In support of that claim they rest on *337 three items of evidence, viz.: (1) The fact that the original deed from the City containing the restrictive covenant was duly recorded, (2) the fact that attached to the building contract between the City and the Fairmount Company is a map showing that the lands were laid out for one- and two-family houses, and (3) the fact that, as admitted in the stipulation, the Fairmount Company advertised that it was erecting and selling two-family houses and made that representation to each purchaser of such dwelling houses, intending that the said representation apply alike to those buildings that had two apartments and those that had four apartments. None of these facts even points in the direction of a community scheme. As already shown, the restrictive covenant was a personal one. The act of recording the deed containing that covenant cannot alter the character of the covenant and convert it into one enforceable by these plaintiffs. Nor does the laying out of the lots on a map advance the plaintiff's position. The map indicates graphically what is expressed in the restrictive covenant, and nothing more. Finally, the representation made to each purchaser, that what he was buying was a two-family house, was intended to persuade those who bought four-family houses that they were in fact buying two-family houses, a bit of legerdemain difficult to understand. There is not the slightest bit of evidence that the Fairmount Company in its advertising material or in its other representations expressed assurance to its purchasers that its remaining undeveloped lands would be restricted to the limited use. Had the selling company and its purchasers dealt with the idea that there was to be a community scheme, the simplest of language could have accomplished that result. Not a single one of the 90 deeds carries with it the slightest assertain or assurance of any general restrictive plan. It is therefore held that no general or community scheme was ever contemplated or was ever established.
On the other hand, if a community scheme were to be assumed, plaintiffs are no longer free to seek its enforcement. Almost all of the 122 buildings erected by the Fairmount *338 Company are four-family houses. Each purchaser of a four-family house knew, or must be held to have known, that he was buying a structure departing from that contemplated by the restrictive covenant in question. The building was there to be seen and the inspection was revealing. Each said purchaser also knew that every other like building in the development constituted a like departure and violation. By common acceptance and acquiescence and by uniform breach the scheme limited to one- and two-family houses, if one ever existed, was effectively abandoned. Thus there ceased to exist a limitation as to the number of families to be accommodated in any one dwelling structure. A case illustrative of abandonment by common acquiescence and violation is that of Ocean City Land Co. v. Weber, 83 N.J. Eq. 476, 91 A. 600.
Plaintiffs have in their briefs advanced two arguments which call for comment. They insist that Section 40:60-51.2 of the Revised Statutes of New Jersey, recited in the City's resolution modifying the restrictive covenant, has no application because the Act, by its language, refers to covenants imposed "heretofore." It is pointed out that the Act was amended the last time in 1946, the year before the City of Newark passed its deed to the Fairmount Company and exacted the restrictive covenant in question. It is argued that the power given by the Act may be exercised only with respect to covenants which are antecedent to the enactment. Considering the underlying purpose of the Act, the construction contended for is strained and abortive. The legislative intent was to express and declare the freedom of municipal bodies to waive, release and modify restrictive covenants imposed by them on sales of lands. The Act was intended to be enabling and remedial and there appears no reason why the power should be allowed with respect to covenants antedating the Act and denied in respect of covenants subsequent thereto. Plaintiffs furnish no decisions from our own courts supporting their argument. There are, however, four cases which, because of the purpose of the legislation, gave to the word "heretofore" a broader meaning embracive of the word "hereafter." *339 Perrine v. Farr, 22 N.J.L. 356, 365; State v. Troth, 34 N.J.L. 377, 382; Commissioners of Matawan v. Horner, 48 N.J.L. 441, 445; Butler v. Montclair, 67 N.J.L. 426, 432. In each of the last cited cases the court permitted a latitude of construction so as to give effect to the underlying purpose of the legislation. I therefore hold that R.S. 40:60-51.2 applies to all covenants made at any time prior to the exercise of the power conferred by that Act.
If I be in error in giving the construction last stated, the situation remains unaltered. The section in question is not needed to sustain the City's resolution. R.S. 40:60-26 provides that municipalities may impose conditions and restrictions on the use to be made of lands sold by it "in the manner and to the same extent as any other vendor of real estate." Implicit in this power to impose restrictions is the necessarily related power of altering, relaxing or waiving such restrictions. Any other conclusion would lead to an insuperable difficulty. Frequently a municipality, disposing of property acquired at tax lien foreclosure, imposes restrictions based on then existing conditions and on a then existing policy. Conditions change and policies must be revised in the interest of the public good. If such covenants must remain perpetually rigid and unchangeable and the municipality completely paralyzed with respect to a needed change, considerable property will be so encumbered and circumscribed as to interfere with the public good. Thompson in his work on real property, Vol. 4, § 3617, p. 716, says: "A covenant may be released directly or indirectly by the person entitled to enforce it." The foregoing statement is a fundamental rule of the law of contracts and applies alike to all contracting parties, private or public. It requires no statute to enable a municipal covenantee to modify, waive or surrender its right to enforce a covenant exacted by it. The power is there by common law. The only limitation on it is that it be exercised honestly and in good faith. I hold that it was in the instant case so exercised.
Plaintiffs ask that the City of Newark be compelled *340 to bring action against the Fairmount Construction Company for alleged breach of the restrictive covenant and to recover the difference in value between what the company paid for its lands in March, 1947, and what was its value in October and November of 1949, when the City amended the zoning ordinance and adopted the resolution, both of which actions released the lands from the restriction to one- and two-family houses. A value differential of at least $30,000 is admitted by the stipulation. For two reasons I decline to grant that relief. I have already held, on the authority of Taylor v. Hackensack, supra, that the zoning amendment here involved was within the legislative power of the City Commissioners and is valid. See Crow v. Town of Westfield, 136 N.J.L. 363. I have also indicated elsewhere above in this opinion that the action of the City in adopting the resolution relating to the restrictive covenant was proper, valid and within the City's power. There is not the slightest evidence before me indicative of any wrong on the part of the covenantor, the Fairmount Construction Company, in seeking the said municipal action and now enjoying the relaxation it furnishes. True, the Fairmount Company built four-family houses, which was a decided departure from its covenant. To this the City assented and is now by that assent estopped from complaint. Aside from this, the City had the right at any time to modify the restrictive covenant and allow the departure now complained of. It might have done so by formal resolution. It did so by acquiescence. The form may be different but the substance is quite the same.
Plaintiffs also ask that the City of Newark be compelled to bring action against the Fairmount Construction Company "to recover the possession of the vacant lands remaining of the lands sold by said City to said company, such action to be based on the company's alleged breach of the restriction contained in the deed of conveyance." It needs no citation of authorities to indicate that this demand is altogether without merit. Even if there had been a breach of the restrictive covenant, that breach could not give rise to a *341 cause of action in the City to recapture the lands sold. We are dealing here with a simple covenant, not a condition. The estate conveyed by the City to the Fairmount Company was not a base or defeasible one, one dependent upon the observance of a condition, the breach of which would terminate the grant and give rise to a right of "reverter" in the grantor-city. The estate here was one in fee simple, absolute and unconditional. The relief here discussed will be denied.
The argument has been made that the zoning amendment here involved was designed to accomplish, and in fact does accomplish, what has sometimes been called "spot zoning." My notion of "spot zoning" is an altogether different thing. Permitting a radical departure in the use of a single lot or a small area which is situated in a much larger territory dedicated to a vastly different use would furnish an example of "spot zoning." An amendment which would allow one or a few lots in a highly restricted residence district to be used for business purposes would be a further example of such objectionable zoning. Here the court is dealing with the largest area in the entire City of Newark still unimproved and awaiting building development. The zoning amendment here affects a territory of 47 acres, composed of the 32 acres upon which it is proposed to erect apartment houses and the 15 acres still owned by the City of Newark. Upon those 15 acres there are only two public buildings and upon the 32 acres there are no buildings. The 32-acre tract may well be regarded as self-integrated and, in a zoning sense, unrelated to adjoining properties. It is significant that none of the houses owned by the objectors face any of the boundary lines of the 32-acre tract, and only the rear of some of the houses faces the easterly boundary line of that tract. On each such rear area is located a two-car garage, the line of garages in itself constituting a very decided line of demarcation. In addition to this there is a buffer area of at least 250 feet of land between each house and the tract in question. A change in zone applying to the whole of 47 acres can hardly be called "spot zoning." It is interesting to note the areas involved in *342 the following two cases where zoning ordinances were amended to change one-family residence districts to zones less restricted; Crow v. Westfield, supra, 11.6 acres; Plass v. Bloomfield, 134 N.J.L. 580, 21 acres.
The witness Cavicchia, who has for the last six years been chairman of the Central Planning Board of the City of Newark, testified that the erection of the proposed apartments would make the tract "an exclusive, fine, clean neighborhood with plenty of light and air for the people who inhabit not only the apartment houses but the neighborhood as well;" that the development would be a distinct benefit to the City of Newark, including the Ivy Hill section; that the apartment houses would be a distinct improvement over the type of construction put in the neighborhood by the Fairmount Construction Company; that the 32-acre tract would constitute a neighborhood by itself and that in allowing the construction of apartment houses on that tract no "spot zoning" would be involved. With all of this I agree. It accords with the other credible evidence in the case and with the result of my own inspections and observations. All of these factors were considered by the City Commissioners, who proceeded with caution and with prolonged deliberation. Their actions were not arbitrary or capricious, and the zoning ordinance and resolution under review are not only presumptively valid but have been affirmatively shown to be such.
Present in the case are all who bought dwelling houses from the Fairmount Construction Company. Those purchasers who are not in the cause in the position of plaintiffs were brought in as defendants to cross-claims. All such purchasers were also brought in as a "class" and fourteen of them were designated as representatives of that class. Counsel assigned to them are the same who have most actively prosecuted their attack upon the aforementioned action of the City of Newark. There are no interests affected by the decision in this case that have not been fully and properly represented herein.
The relief sought by the plaintiffs in both consolidated actions against the defendants the City of Newark, Fairmount *343 Construction Company, a corporation, and Maurice Levin and George Levin will be denied. Judgment in favor of all said defendants will be entered in accordance with the conclusions herein expressed. The judgment will be without costs in favor of or against any party in the action.
Present form of judgment.